UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ROBERT A. URCIUOLI,<br>FRANCES P. DRISCOLL,<br>PETER J. SANGERMANO, JR., and<br>ROGER WILLIAMS MEDICAL CENTER | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CR 06 02 T<br>CRIMINAL NO.<br><br>In violation of 18 U.S.C. §§ 2, 371, 1341 and 1346 |

FILED
JAN 05 2006
U.S. DISTRICT COURT
DISTRICT OF RHODE ISLAND

**INDICTMENT**

The Grand Jury charges that:

**Introduction**

At all times material to this Indictment:

1. Defendant, ROBERT A. URCIUOLI ("URCIUOLI"), was a resident of the State of Rhode Island, and was President and Chief Executive Officer of Roger Williams Medical Center ("RWMC").

2. Defendant, FRANCES P. DRISCOLL ("DRISCOLL"), was a resident of the State of Rhode Island, and was Senior Vice President, External Affairs, Corporate Communications and Development for RWMC, from on or about 1989 until on or about May 5, 2000.

3. Defendant, PETER J. SANGERMANO, Jr. ("SANGERMANO"), was a resident of the State of Rhode Island, and was a principal of Village Retirement Communities, LLC. Village Retirement Communities was a not-for-profit limited liability corporation incorporated under the laws of the State of Rhode Island that was in the business of developing and operating

assisted living facilities.

4. Defendant, ROGER WILLIAMS MEDICAL CENTER, was a not-for-profit corporation incorporated under the laws of the State of Rhode Island for the purpose of being a parent company of Roger Williams Hospital ("Hospital") and to provide fund raising activity for Roger Williams Hospital. RWMC was also the sole shareholder in three additional organizations: (a) Roger Williams Realty Corporation ("Roger Williams Realty"), a for-profit realty corporation incorporated under the laws of the State of Rhode Island that owned and managed real estate for the benefit of RWMC; (b) Elmhurst Extended Care Facilities, Inc., a for-profit corporation incorporated under the laws of the State of Rhode Island that operated a skilled nursing and intermediate care facility; and, (c) Elmhurst Health Associates, a for-profit corporation incorporated under the laws of the State of Rhode Island that operated a pharmacy and provided outpatient laboratory services.

5. The Village at Elmhurst, LLC, (the "Village"), was an assisted living facility that was equally owned by Roger Williams Realty and SANAT Properties, LLP, ("SANAT"). SANAT was a partnership between Village Retirement Communities and NATCO Products, Inc.

6. From on or about January 2, 1995, through on or about March 9, 2004, John A. Celona, who has been separately charged ("Celona"), was a State Senator elected to the Rhode Island General Assembly who served as a member of the Rhode Island Senate Committee on Commerce, Housing and Municipal Government, formerly the Senate Corporations Committee ("Senate Corporations Committee"). From on or about January 4, 2001, through on or about December 11, 2003, he was Chairman of the Senate Corporations Committee. Celona also served as a member of the Senate Committee on Health, Education and Welfare from on or about

January 2, 1995, through on or about June 30, 1999.

7. The Senate Corporations Committee possessed jurisdiction over legislation and matters affecting commerce, for-profit as well as not-for-profit business corporations, including but not limited to, health care providers, health care related insurance companies, and pharmacies.

8. A substantial portion of RWMC's income was derived from reimbursement by health care entities operating health plans for services rendered to patients. In 2000, those health care entities included Blue Cross & Blue Shield of Rhode Island ("Blue Cross") and United Healthcare New England ("United"). Various financial aspects relating to reimbursements by Blue Cross and United were negotiated through contract negotiations between the insurance companies and the hospitals that they reimbursed. In addition, reimbursement by the insurance companies to the hospitals was also the subject of legislative action in the Rhode Island General Assembly. As part of the legislative process, when reimbursement issues were addressed by the State Senate, they were primarily heard before the Senate Corporations Committee.

9. The Senate Committee on Health, Education and Welfare possessed jurisdiction over legislation affecting issues such as health and human services, mental health, children and education.

10. The State of Rhode Island and its citizens had an intangible right to the honest services of its officials and employees. As an elected public official of the State, Celona therefore owed the State and its citizens a duty to: (a) refrain from receiving payments and benefits that would, (i) improperly affect the performance of his official duties or (ii) influence his official action or inaction; and, (b) disclose conflicts of interest and other material

information in matters over which he exercised influence, authority, and discretion that resulted in his personal gain.

11. The Rhode Island Ethics Commission ("Ethics Commission") was an independent commission created by the State of Rhode Island. The Ethics Commission was charged with ensuring that public officials and employees adhered to the highest standards of ethical conduct, respected the public trust and the rights of all persons, were open, accountable, responsive, avoided the appearance of impropriety, and did not use their position for private gain or advantage. In June of 1987, the Rhode Island General Assembly enacted the Rhode Island Code of Ethics in Government ("Code of Ethics"). The Ethics Commission had the authority to investigate violations of the Code of Ethics and enforce its provisions. The Ethics Commission also possessed the authority to issue advisory opinions relating to the requirements under the Code of Ethics. As an elected State official, Celona was subject to the Code of Ethics.

12. In 1997, the Rhode Island General Assembly passed legislation referred to as "the Hospital Conversion Act," which placed restrictions on the purchase of not-for-profit hospitals by for-profit organizations. The Hospital Conversion Act was particularly significant to RWMC because, at the time, there was a pending sale of RWMC to a for-profit organization known as Columbia/HCA Healthcare Corporation. ("Columbia/HCA"). Passage of the Hospital Conversion Act effectively prevented the sale of RWMC to Columbia/HCA. Prior to the passage of the Hospital Conversion Act, RWMC had contacted various legislators, including Celona, to seek their support in opposing the legislation. Celona was a vocal supporter of RWMC's position on the Hospital Conversion Act.

## COUNT 1

**(Conspiracy to Deprive the Citizens of John Celona's Honest Services)**

13. The Grand Jury realleges and incorporates by reference paragraphs 1 through 12 of this Indictment as though fully set forth herein.

14. From in or about August of 1997, and continuing until on or about January 8, 2004, in the District of Rhode Island, defendants, URCIUOLI, DRISCOLL, SANGERMANO and RWMC, knowingly, wilfully, and unlawfully combined, conspired, confederated, and agreed with each other, and with Celona, to commit an offense against the United States, specifically, having devised and intending to devise a scheme and artifice to defraud the State of Rhode Island and its citizens of their intangible right to the honest services of John Celona and to have those services performed free from deceit, favoritism, bias, conflict of interest and self-enrichment and for the purpose of executing that scheme and artifice, to knowingly and willfully cause to be place in an authorized depository for mail, according to the directions thereon, to the person to whom it was addressed, matter to be delivered by the United States Postal Service, in violation of 18 U.S.C. §§ 1341 and 1346.

### A. The Principal Objects of the Conspiracy

15. It was the object of the conspiracy to pay money to Celona, pursuant to a consulting agreement, so as to improperly influence and affect the official actions of Celona, specifically, to cause him to use his influence, power, and authority as a State Senator to benefit the political and financial interests of RWMC and its affiliates.

16. It was further an object of the conspiracy to deceive the State of Rhode Island and its citizens concerning Celona's relationship with RWMC in order for Celona to continue to

promote the political interests of RWMC and its affiliates.

**B. Means and Methods of the Conspiracy**

17. It was part of the conspiracy that defendants, URCIUOLI, DRISCOLL, SANGERMANO and RWMC, caused the Village to enter into a consulting agreement with Celona in order to provide him money in exchange for his political support, to include support for matters in which RWMC and the Village had an interest, which were pending before the Rhode Island General Assembly and the Senate Corporations Committee.

18. It was further part of the conspiracy that defendants, URCIUOLI, DRISCOLL, SANGERMANO and RWMC, along with Celona, knowingly and willfully failed to disclose to the public that Celona had an improper conflict of interest which deprived the State of Rhode Island and its citizens of their intangible right to his honest services in that Celona obtained money from RWMC in exchange for his political support.

19. It was further part of the conspiracy that defendants, URCIUOLI, DRISCOLL, SANGERMANO and RWMC, influenced and affected Celona in his official actions as a State Senator and Chairman of the Senate Corporations Committee in a manner which benefitted RWMC and its affiliates, including but not limited to directing Celona to use his influence, power and authority:

a. to take official actions and refrain from taking official actions all to benefit RWMC and its affiliates;

b. to influence other legislators to act or fail to act in such a way as to benefit RWMC and its affiliates;

c. to provide information, acquired in the course of and by reason of his

official duties, to RWMC and its affiliates;

d. to influence people and companies who had interests before the Rhode Island General Assembly and were doing business with RWMC and its affiliates in a manner intended to financially benefit RWMC and its affiliates.

20. It was further part of the conspiracy that defendants, URCIUOLI, DRISCOLL, SANGERMANO and RWMC, and Celona deceived the State of Rhode Island and its citizens concerning his relationship with RWMC by, among other things:

a. disguising the nature of Celona's relationship with RWMC by having the Village hire and pay Celona;

b. failing to disclose Celona's conflict of interest, including to the Ethics Commission;

c. providing false and misleading information to the Ethics Commission;

d. seeking an advisory opinion from the Ethics Commission based on false, misleading, and incomplete information.

**C. Overt Acts**

In furtherance of the conspiracy and to accomplish its objectives and purposes, at least one of the following Overt Acts, among others, was committed by one or more of the co-conspirators in the District of Rhode Island.

**1. The Consulting Agreement**

21. In or about August of 1997, Celona met with URCIUOLI and asked URCIUOLI for employment at Roger Williams Hospital. This meeting took place immediately after Celona

had supported the Hospital's position in opposition to the Hospital Conversion Act.

22. In or about August of 1997, URCIUOLI advised DRISCOLL and others, known and unknown to the Grand Jury, that he was interested in hiring Celona for a job as a consultant to RWMC.

23. On or about October 15, 1997, DRISCOLL drafted a job description for Celona, entitled "Marketing Associate for Senior Affairs." The job description identified the "objective" of the job to be "to heighten awareness among seniors (the elderly) of the greater Providence community as to programs and services available at Roger Williams Medical Center and its affiliated entities." The job description also provided a list of duties for Celona to perform and stated that "this position reports to the Senior Vice President, External Affairs, Corporate Communications and Development." At the time, DRISCOLL was the Senior Vice President, External Affairs, Corporate Communications and Development

24. On or about October 15, 1997, URCIUOLI caused the job description for Celona to be changed from a description entitled "Marketing Associate for Senior Affairs" to a description entitled "Consulting Responsibilities." The "objective" of the job was also changed to read as follows: "to heighten awareness among seniors (the elderly) of the greater Providence community as to programs and services available at the Villages at Elmhurst and Waterman Lake." The job description also a provided a list of duties for Celona to perform but no longer provided that Celona would report to DRISCOLL.

25. On various dates, from on or about October 15, 1997, to on or about July 22, 1998, URCIUOLI, DRISCOLL and SANGERMANO caused the consulting agreement to be drafted, redrafted and executed in a manner so that it falsely and fraudulently purported to be a

consulting agreement between Celona and the Village which stated that "[t]he management of the Village at Elmhurst wishes to engage you, John Celona (the "Consultant") to provide the following services on behalf of the Village of Elmhurst and Elmhurst Extended Care ("Elmhurst")," when URCIUOLI, DRISCOLL and SANGERMANO all knew that the true nature of the employment agreement was for Celona to perform duties for RWMC and to report to DRISCOLL.

**2. Payment for Celona's Services**

26. On various dates in the fall of 1997, URCIUOLI discussed the hiring of Celona with SANGERMANO. SANGERMANO initially opposed the Village's hiring of Celona.

27. At some time after in or about the fall of 1997 to some time prior to on or about December 11, 1997, URCIUOLI advised SANGERMANO that Roger Williams Realty would agree to be responsible for Celona's salary. As a result, SANGERMANO agreed to have the Village enter into the Consulting Agreement with Celona.

28. On or about February 1, 1998, Celona began working for RWMC and the Village and reporting to DRISCOLL.

29. On or about February 27, 1998, Celona commenced sending invoices to SANGERMANO for payment for his services. His first invoice was for $2,800. Pursuant to DRISCOLL's request, Celona sent a copy of the invoice, by mail, to DRISCOLL.

30. On or about March 8, 1998, the Village mailed a check to Celona for $2,800, which amount was funded by Roger Williams Realty.

31. From on or about February 28, 1998, through on or about December 31, 2003, Celona continued to submit invoices for his services, by mail, to the Village.

32. On diverse dates from in or about February 27, 1998, through on or about January 8, 2004, defendants, URCIUOLI, DRISCOLL, SANGERMANO and RWMC, caused 72 checks to be issued to Celona by mail, totaling approximately $260,638.63, which money was disguised as payments by the Village for services as a consultant on elderly affairs.

**3. <u>Celona's Initial Duties for the Hospital</u>**

33. In or about February of 1998, DRISCOLL and SANGERMANO directed Celona to work to "defeat" Senate Bill 98-H 8229, an "Act Relating to Residential Care and Assisted Living Facilities," which would prohibit health facilities (such as the Village) from holding themselves out as offering Alzheimer's care to patients unless the facilities were licensed as nursing homes or hospitals. Such an Act, if enacted into law, would have had a negative impact on the finances of the Village in that the Village would not be allowed to offer Alzheimer's care to patients without being licensed as a nursing home or hospital.

34. In or about February of 1998, Celona discussed Senate Bill 98-H 8229 with other legislators and advocated that the legislation be "held," which would effectively prevent the legislation from advancing.

35. On various dates prior to 1998 and in or about early 1998, URCIUOLI advised DRISCOLL and others known and unknown to the Grand Jury, that Roger Williams Hospital was not getting its "fair share" of rescue runs from certain municipalities. URCIUOLI also advised that rescue runs were a source of revenue for the Hospital because they brought revenue producing patients into the facility.

36. In or about early 1998, URCIUOLI advised an individual known to the Grand Jury that URCIUOLI was going to have Celona take care of the rescue run problem politically.

37. From in or about March 1998 through May 1999, at the direction of URCIUOLI and DRISCOLL, Celona attempted to influence municipalities to increase the number of ambulance transports directed to the Hospital.

38. On or about March 6, 1998, Celona provided a report to DRISCOLL in which he advised that he had met with the Chief of the North Providence Fire Department in order to increase the number of emergency transportation runs from that city to the Hospital. Celona advised that the Chief had assured him that he would direct emergency transportation personnel to recognize the needs of RWMC patients. Celona ended his report to DRISCOLL by saying, "P.S. Does Peter Sangermano need a copy of my original statement."

39. In or about early 1998, RWMC continued to pursue mergers which would result in a conversion of RWMC from a not-for-profit corporation to a for-profit corporation. During that time, URCIUOLI and DRISCOLL informed Celona that they opposed Senate Bill 98-S 2796, an bill which prohibited directors, trustees, or officers from serving on the board of a newly converted hospital.

40. On or about March 16, 1998, Celona sent DRISCOLL a facsimile in which he advised that, in regard to Senate Bill 98-S 2796, he was making calls to "kill the bill in Committee."

### 4. **The Ethics Commission**

41. In or about the fall of 1997, URCIUOLI, DRISCOLL, and others known and unknown to the Grand Jury decided that Celona should obtain an opinion from the Rhode Island Ethics Commission on the extent to which Celona could continue to perform his legislative functions in light of the consulting agreement. URCIUOLI directed legal counsel to RWMC to

prepare a letter to the Ethics Commission on Celona's behalf.

42. On or about March 26, 1998, DRISCOLL and URCIUOLI reviewed a draft letter to the Ethics Commission, prepared by RWMC's legal counsel, stating that Celona was employed by the Village to promote services provided to senior citizens. In this draft letter, legal counsel for RWMC requested an advisory opinion regarding the extent to which Celona, as a State Senator employed by the Village, could continue to propose, debate and vote on healthcare issues before the General Assembly. Neither DRISCOLL nor URCIUOLI requested or made any changes to the letter so that the letter would reflect the true identity of his employer and the true nature of the work that Celona had been and would be performing.

43. On or about March 31, 1998, DRISCOLL sent a facsimile to Celona asking him to review the draft letter to the Ethics Commission. Celona responded to DRISCOLL by stating that the letter was "fine" and also advising DRISCOLL on the status of Senate Bill 98-S 2796. Neither Celona nor DRISCOLL requested or changed the draft letter so as to advise the Ethics Commission that Celona was actively working "to kill" Senate Bill 98-S 2796 or, in any other manner, reflect the true identity of his employer and the true nature of the work that Celona had been and would be performing.

44. On or about April 6, 1998, URCIUOLI, DRISCOLL, Celona and others known and unknown to the Grand Jury, sent a letter to the Ethics Commission stating that Celona was employed by the Village to promote services provided to senior citizens. The Consulting Agreement between Celona and the Village was attached to the letter. In this letter, legal counsel for RWMC requested an advisory opinion regarding the extent to which Celona, as a State Senator employed by the Village, could continue to propose, debate and vote on healthcare issues

before the General Assembly. In the April 6, 1998 letter, URCIUOLI, DRISCOLL, and Celona failed to disclose that Celona had been performing political services for RWMC. URCIUOLI and DRISCOLL also failed to disclose that RWMC would be funding the payments made by the Village to Celona. In so doing, URCIUOLI, DRISCOLL, and Celona misrepresented the true identity of his employer and misrepresented the true nature of the work he had been and would be performing. On or about April 23, 1998, in response to the false and fraudulent April 6, 1998, advisory opinion request, Celona received an opinion from the Ethics Commission outlining the legislative duties that he could undertake.

**5. <u>Celona Supports the Hospital's Merger Prospects</u>**

45. On or about December 7, 1998, during a time that RWMC continued to seek a merger with a for-profit corporation, Celona advised URCIUOLI that he had spoken on behalf of RWMC to a potential merger partner for the Hospital.

46. On or about January 4, 1999, Celona sent a letter, drafted on Celona's Senate letterhead, to a potential merger partner for the Hospital, advocating the virtues of the Hospital. Celona forwarded a copy of the letter to URCIUOLI.

47. On or about June 14, 1999, Celona asked DRISCOLL "to advise" him on Senate Bill 99-S 1053, a bill which would amend the Hospital Conversion Act by requiring that the Department of Health review acquisitions of not-for-profit hospitals by for-profit corporations.

48. On or about February 12, 2000, Celona asked DRISCOLL whether he should oppose a proposed merger between Lifespan and Care New England which was being addressed by the Rhode Island Attorney General.

49. On or about February 14, 2000, DRISCOLL directed Celona to oppose the proposed merger between Lifespan and Care New England because the merger could have an adverse financial impact on the Hospital.

**6. Celona Supports Moratorium Legislation Beneficial to the Village**

50. On or about March 23, 1999, during the same time period that Celona was being paid by the Village with monies provided by Roger Williams Realty, SANGERMANO asked Celona to have a State Representative and a State Senator sponsor a bill amending the extension of the moratorium on licensing new nursing home beds, House Bill 99-H 6122. Such an amendment was expected to have a positive impact on the finances of the Village. SANGERMANO provided Celona with a proposed amendment to the legislation.

51. On or about March 23, 1999, Celona asked DRISCOLL for her permission to act on SANGERMANO's request regarding the moratorium legislation for the Village.

52. On or about November 6, 2000, Celona forwarded draft moratorium legislation to SANGERMANO in anticipation of SANGERMANO's meeting with another legislator.

53. From on or about March 23, 1999, to on or about February 14, 2001, Celona provided political assistance and obtained legislative sponsors for an amendment to the moratorium legislation, pursuant to SANGERMANO's request and with the approval of DRISCOLL.

**7. Celona Opposes the Cancer Council on Behalf of RWMC**

54. On January 20, 1999, House Bill 99-H 5220 was introduced into the Rhode Island General Assembly for the purpose of establishing a Cancer Council which would be responsible for, among other things, promoting the development and coordination of effective and efficient

statewide public and private policies for the treatment of cancer. At some point after on or about January 20, 1999, through in or about March of 1999, URCIUOLI and DRISCOLL both advised Celona that they, and RWMC, opposed the Cancer Council legislation because they expected that the Cancer Council would be operated and directed by a doctor who had previously been on staff at RWMC and for whom URCIUOLI and DRISCOLL felt animosity. In addition, they expected that the Cancer Council could have a negative impact on the finances of the Hospital. As a result, URCIUOLI and DRISCOLL directed Celona to work to defeat the legislation.

55. On or about February 23, 1999, DRISCOLL sent a facsimile to Celona in which she asked him to "subtly" check on legislation establishing a Cancer Council in Rhode Island. Specifically, she asked Celona "[w]here is it going. Who's supporting in Senate and . . . reps."

56. On or about February 23, 1999, Celona sent a facsimile to DRISCOLL forwarding a copy of House Bill 99-H 5220. Celona advised DRISCOLL that "[t]here is no Senate Companion. We will talk about my method." DRISCOLL directed Celona to work to defeat the legislation and to contact a State Representative whose identity is known to the Grand Jury ("State Representative No. 1") and advise her that she would suffer negative political ramifications if she supported the Cancer Council.

57. On or about February 24, 1999, Celona sent a facsimile to DRISCOLL advising that, as directed, he had contacted State Representative No. 1 about the Cancer Council and told State Representative No. 1 "in simple terms that, being supportive of this bill could be a political problem in the future for her. She agreed to do nothing to support the bill. I told her that I would continue to keep in touch with her regarding this bill. I will monitor the status of the bill regarding a hearing date."

58. On or about March 6, 1999, Celona sent a memo to DRISCOLL advising her that he spoke with State Representative No. 1 regarding the Cancer Council legislation, and that State Representative No. 1 "agreed to back off on the bill."

59. On or about June 21, 1999, Celona sent a facsimile to DRISCOLL advising her about the status of the Cancer Council legislation and stating "[s]o far so good. I'll keep you posted." DRISCOLL forwarded Celona's facsimile to URCIUOLI with a note that stated "Bob, FYI C Council Bill follow up."

60. On or about February 15, 2000, DRISCOLL requested that Celona obtain a meeting with State Representative No. 1. On or about February 29, 2000, Celona arranged a luncheon meeting with State Representative No. 1. Celona and DRISCOLL attended this luncheon meeting in order to discuss the Cancer Council and to dissuade State Representative No. 1 from supporting the legislation.

**8. <u>Celona Opposes PILOT Legislation on Behalf of RWMC</u>**

61. On January 13, 1999, House Bill 99-H 5086 was introduced into the Rhode Island General Assembly. That bill, if enacted into law, would have required tax exempt institutions in the City of Providence to make up for any potential financial shortfall in the Payment In Lieu of Taxes program ("PILOT"). URCIUOLI and DRISCOLL directed Celona to work to defeat the legislation because such a bill, if enacted into law, would have had a negative impact on the finances of RWMC.

62. On or about January 13, 1999, through on or about March 9, 1998, DRISCOLL directed Celona to contact State Representative No. 1 to advise her that it would be politically harmful to her, within her district, if she supported the PILOT legislation.

63. On or about March 8, 1999, Celona sent a facsimile to DRISCOLL stating "Fran, I spoke with [State Representative No. 1] by telephone on Sunday regarding the Payment in Lieu of Taxes (Pilot) bills that she introduced. She informed me that they were dead. I informed her that they would be extremely harmful to RWMC if passed and told her that she should remember this before sponsoring them again. - I also said that she and I would speak in person re: the cancer council." DRISCOLL responded "John - Have you spoken to her. She called this a.m. Make Apt to talk to her."

64. On or about March 9, 1999, Celona sent a facsimile to DRISCOLL stating "I spoke with [State Representative No. 1] again today. First, she reiterated that the PILOT legislation is dead. I told her that she should watch what she signs in the future because these bills would be devastating for RWMC and her district. She agreed. We also spoke of the Cancer Council legislation. She agreed to back off on the bill. I will speak more in depth with you regarding our discussion."

**9. <u>Bone Marrow Legislation</u>**

65. On February 2, 1999, House Bill 99-H 5917 was introduced into the Rhode Island General Assembly. That bill, if enacted into law, would have required the Department of Health and Roger Williams Cancer Center to facilitate, foster and assist registration of bone marrow donors by promoting annual bone marrow donor drives and established a centralized bone marrow registration list. From on or about February 2, 1999, to on or about February 24, 1999, DRISCOLL advised Celona that she did not like the bone marrow legislation because the bill did not contain a provision to reimburse RWMC for the cost of registering uninsured patients.

66. On or about a date prior to February 24, 1999, DRISCOLL directed Celona to advocate an amendment to House Bill 99-H 5917 so that it would contain a provision to reimburse the Hospital for the cost of registering uninsured patients.

67. On or about February 24, 1999, Celona reported to DRISCOLL that he had contacted another State Representative known to the Grand Jury ("State Representative No. 2") who advised Celona that the bill was drafted incorrectly and that State Representative No. 2 would amend it to cover the cost of bone marrow registration for those who did not have health insurance coverage.

**10. <u>Celona's Other Undeclared Lobbying Duties</u>**

68. On or about February 4, 2000, Celona wrote to DRISCOLL that DRISCOLL had had an "excellent idea for us to formulate some views regarding legislation. As we both know it is better to (sic) proactive than reactive. To that end a lunch meeting with Bob [URCIUOLI] would be beneficial to serve that purpose."

69. On or about February 8, 2000, Celona wrote to DRISCOLL that he had been advised by a State Senator known to the Grand Jury ("State Senator No. 1") that "[w]e should act in an extremely deliberate fashion until the seas calm" on health care bills. Celona also advised that "[t]his makes it all the more important, for us at RWMC to develop a legislative strategy as soon as possible." DRISCOLL forwarded the memorandum to URCIUOLI.

70. On or about February 11, 2000, Celona wrote a note to DRISCOLL stating "Fran - In the house alone, there have been 120 'health Care' bills introduced. I will continue to research [and] prioritize."

71. On or about February 29, 2000, Celona forwarded a copy of House Bill 99-H 6183, to DRISCOLL upon her request. House Bill 99-H 6183 was an Act Relating to Ovarian Cancer Education which would require the Department of Health and the Cancer Council to sponsor annual public education campaigns about ovarian cancer. Celona also advised DRISCOLL that he had attended a hearing on monthly interim payment legislation and that "[d]uring the hearing obviously, I supported the position of the hospital during questioning."

72. On or about June 26, 2001, an article appeared in the North Providence Star titled "Senator Celona urges delegation to reverse Medicare cuts." In the article Celona stated, "[w]e in state government particularly in the Senate are working with health care providers to ensure their solvency. In the Corporations Committee that I chair we have been working on such issues as prompt payment and utilization review to help the providers." Celona did not reveal that he was also being directed to work on prompt payment and utilization review issues by his employer, RWMC. URCIUOLI wrote to Celona in response to the article and stated "thanks for your help and support."

**11. <u>Celona Supports RWMC before Blue Cross Blue Shield</u>**

73. On or about March 7, 2000, Celona sent a facsimile to DRISCOLL, forwarding position papers regarding Senate Bill 2000-S 2701 and advising that "the bill was 'held for further study' in Senate Corporations today. [State Senator No. 1] is reposting the bill for March 23rd. But indications are he wants the parties to get together to solve the issue without legislation at this time. He will also suggest a study commission to craft legislation." Senate Bill 2000-S 2701 was introduced on or about February 10, 2000. If enacted into law, that bill would have required health care entities operating health plans to pay health care providers within 30 days following

the receipt of a clean claim from such provider for health care services rendered to persons enrolled in such health plans.

74. On or about various dates from the Fall of 1997 through the end of 2003, URCIUOLI advised Celona that he was not satisfied with the reimbursement rates that the Hospital was receiving from Blue Cross and United and directed Celona to advocate, as Chairman of the Senate Corporations Committee, for more favorable reimbursement from each organization.

75. On or about April 16, 2000, Celona sent a facsimile to URCIUOLI advising URCIUOLI that Celona would be a panelist at a forum sponsored by Blue Cross and asking URCIUOLI "[i]f you have any areas to focus on, other than the obvious such as the hospital prompt payer issue, etc., please let me know so that I can attempt to articulate the points from the hospital perspective." On that date, Celona also advised URCIUOLI that he had cleared his participation in the forum with DRISCOLL.

76. On or about April 20, 2000, Celona sent a facsimile to URCIUOLI advising URCIUOLI that Celona had attended a Blue Cross forum and further advising that "[i]n my discussions, I brought up the 'prompt payment' legislation, BBA and the Hospital Conversion Act as issues that need to be addressed in order to help solve the affordability question." URCIUOLI forwarded Celona's memorandum to all vice-presidents, including DRISCOLL.

77. On or about January 18, 2001, Celona sent a facsimile to URCIUOLI stating "I have been told by [a hospital association] that "Utilization Review" legislation is their main focus and that "prompt payment" will not be this year. I will try to contact you tomorrow to make sure that this is in the best interest of RWMC."

78. On or about February 10, 2001, Celona sent an electronic mail message to URCIUOLI advising that he had met with certain individuals from Blue Cross and a hospital association to discuss reimbursement issues. Celona had called the meeting, by virtue of the power of his appointment as Chairman of the Corporations Committee, in order to advocate RWMC's position. At the meeting, Celona advised representatives of Blue Cross that he wanted to see Prompt Payment accomplished so that hospitals could get their fair share of reimbursement. Celona also advised URCIUOLI that an executive for another hospital had asked to meet with Celona and further stated "I really do not want to meet, but in my capacity as Chairman I have to. Obviously, I will just listen to what he has to say and report to you."

79. On or about December 20, 2001, URCIUOLI and Celona met with representatives of Blue Cross in order to pressure Blue Cross into providing increased reimbursement rates to RWMC.

80. On or about December 21, 2001, Celona sent an electronic mail message to URCIUOLI stating "Bob: I hope I didn't lay it on [a Blue Cross representative] too much yesterday. But it was done in a systematic fashion in order to get them 'in line' for us. Needless to say, I'll keep up the pressure."

81. On or about December 21, 2001, URCIUOLI responded to Celona's December 21, 2001 electronic mail by writing "[y]ou didn't, he deserved to get cranked around. Again - - - - thanks for your help!"

82. On or about February 19, 2002, URCIUOLI and Celona met with representatives of Blue Cross for lunch in order to discuss RWMC's contract with Blue Cross.

83. On or about June 18, 2002, URCIUOLI and Celona met with representatives of Blue Cross in order to discuss RWMC's contract with Blue Cross.

84. On or about a date prior to January 30, 2003, URCIUOLI requested that Celona, by virtue of the power of his appointment as Chairman of the Corporations Committee, obtain a meeting with the Chairman of Blue Cross in order to discuss on-going negotiations because RWMC was having difficulty obtaining a contract on terms favorable to RWMC.

85. On or about a date prior to January 30, 2003, Celona, by virtue of the power of his appointment as Chairman of the Corporations Committee, obtained and participated in a meeting with the Chief Executive Officer and President and other representatives of Blue Cross in order to discuss on-going negotiations between RWMC and Blue Cross.

86. On or about June 24, 2003, URCIUOLI advised the RWMC Finance Committee that the Hospital had obtained a new contract with Blue Cross and negotiations with United would continue.

## 12. Celona Supports RWMC before United

87. On or about a date prior to August 29, 2003, URCIUOLI requested that Celona, by virtue of the power of his appointment as Chairman of the Corporations Committee, obtain a meeting with the Chairman of United in order to discuss on-going contract negotiations because RWMC was having difficulty obtaining a contract on terms favorable to RWMC.

88. On or about August 29, 2003, Celona, by virtue of the power of his appointment as Chairman of the Corporations Committee, obtained and participated in a meeting in his State House office, provided to him as Chairman, with the Chairman and other representatives of United in order to discuss on-going contract negotiations between RWMC and United and to

negotiate terms of a contract between United and RWMC which were favorable to RWMC.

89. On or about various dates after the August 29, 2003, meeting in Celona's Senate office, URCIUOLI directed Celona to contact representatives of United in order to obtain a contract with increased reimbursement from United.

90. On or about October 24, 2003, Celona sent an electronic mail message to URCIUOLI which stated "I just spoke with [a representative of United] and he told me that he had [the Chairman of United] call yesterday to up the United figure. Did he contact you and do you want me to keep pressing."

91. On or about October 28, 2003, URCIUOLI reported to the RWMC Finance Committee that he had received a telephone call from the Chairman of United who stated that United would agree to RWMC's proposal that United pay a 25% increase over the company's prior year contract but requested a freeze on rates for 2 years.

**13. <u>Revisions to the Consulting Agreement</u>**

92. On or about some time prior to October 16, 2000, URCIUOLI agreed to increase Celona's weekly salary from $700.00 to $892.31 per week. URCIUOLI directed his staff to amend the Consulting Agreement accordingly. URCIUOLI did not direct his staff to amend the Consulting Agreement in order to reflect the true identity of Celona's employer and the true nature of the work that Celona had been and would be performing, nor did he direct his staff to amend the information provided to the Ethics Commission to reflect the true nature of Celona's employment with RWMC.

93. On or about October 16, 2000, SANGERMANO sent Celona a letter enclosing two copies of the Consulting Agreement between Celona and the Village increasing Celona's weekly

salary from $700.00 to $892.31 per week that had already been signed by SANGERMANO. In SANGERMANO's letter to Celona, he asked Celona to sign the copies of the Consulting Agreement and return them to SANGERMANO's attention. SANGERMANO did not amend the Consulting Agreement in order to reflect the true identity of Celona's employer and the true nature of the work that Celona had been and would be performing, nor did he amend the information provided to the Ethics Commission to reflect the true nature of Celona's employment with RWMC.

94. On or about some time prior to January 16, 2002, URCIUOLI agreed to increase Celona's weekly salary from $892.31 to $1,000 per week. URCIUOLI directed his staff to amend the Consulting Agreement accordingly. URCIUOLI did not direct his staff to amend the Consulting Agreement in order to reflect the true identity of Celona's employer and the true nature of the work that Celona had been and would be performing, nor did he direct his staff to amend the information provided to the Ethics Commission to reflect the true nature of Celona's employment with RWMC.

All in violation of 18 U.S.C. § 371.

**COUNT 2**
**(Scheme to Defraud the Citizens of John Celona's Honest Services)**

95. The Grand Jury realleges and incorporates by reference paragraphs 1 through 12 of this Indictment, as though fully set forth herein.

96. The Grand Jury further charges that from in or about August 1997, through in or about January 8, 2004, defendants, URCIUOLI, DRISCOLL, SANGERMANO and RWMC, devised and intended to devise a scheme and artifice to defraud the State of Rhode Island and its citizens of their intangible right to the honest services of John Celona and to have those services

performed free from deceit, favoritism, bias, conflict of interest and self-enrichment.

**A. The Principal Objects of the Scheme**

97. It was the object of the scheme to pay money to Celona, pursuant to a consulting agreement, so as to improperly influence and affect the official actions of Celona, specifically, to cause him to use his influence, power, and authority as a State Senator to benefit the political and financial interests of RWMC and its affiliates.

98. It was further an object of the scheme to deceive the State of Rhode Island and its citizens concerning Celona's relationship with RWMC in order for Celona to continue to promote the political interests of RWMC and its affiliates.

**B. Means and Methods of the Scheme**

99. It was part of the scheme that defendants, URCIUOLI, DRISCOLL, SANGERMANO and RWMC, caused the Village to enter into a consulting agreement with Celona, in order to provide him money in exchange for his political support, to include support for legislative matters in which RWMC and the Village had an interest and which were pending before the Rhode Island General Assembly and the Senate Corporations Committee.

100. It was further part of the scheme that defendants, URCIUOLI, DRISCOLL, SANGERMANO and RWMC, along with Celona, knowingly and willfully failed to disclose to the public that Celona had an improper conflict of interest which deprived the State of Rhode Island and its citizens of their intangible right to his honest services in that Celona obtained money from RWMC in exchange for his political support.

101. It was further part of the scheme that defendants, URCIUOLI, DRISCOLL, SANGERMANO and RWMC, influenced and affected Celona in his official actions as a State

Senator and Chairman of the Senate Corporations Committee in a manner which benefitted RWMC and its affiliates, including but not limited to directing Celona to use his influence, power and authority:

a. to take official actions and to refrain from taking official actions all to benefit RWMC and its affiliates;

b. to influence other legislators to act or fail to act in such a way as to benefit RWMC and its affiliates;

c. to provide information, acquired in the course of and by reason of his official duties, to RWMC and its affiliates;

d. to influence people and companies who had interests before the Rhode Island General Assembly and were doing business with RWMC and its affiliates in a manner intended to financially benefit RWMC and its affiliates.

102. It was further part of the scheme that defendants, URCIUOLI, DRISCOLL, SANGERMANO and RWMC, and Celona deceived the State of Rhode Island and its citizens concerning his relationship with RWMC by, among other things:

a. disguising the nature of Celona's relationship with RWMC by having the Village hire and pay Celona;

b. failing to disclose Celona's conflict of interest, including to the Ethics Commission;

c. providing false and misleading information to the Ethics Commission;

d. seeking an advisory opinion from the Ethics Commission based on false,

misleading, and incomplete information.

103. It was further part of the scheme that defendants, URCIUOLI, DRISCOLL, SANGERMANO and RWMC, and Celona undertook the political activities described at paragraphs 21 to 94 of this Indictment, as though fully set forth herein, on behalf of RWMC.

**C. Execution of the Scheme to Defraud**

104. On or about May 4, 2000, in the District of Rhode Island, for the purpose of executing the scheme and artifice to defraud described in paragraphs 95-103, DRISCOLL did knowingly and willfully cause to be placed in an authorized depository for mail matter a check, No. 1054, drawn from the Village's Capital Account made payable to John Celona, in the amount of $2,800, for consulting fees for the month of April, 2000, to be sent and delivered by the United States Postal Service.

All in violation of 18 U.S.C. §§ 2, 1341 and 1346.

**COUNT 3 - 38**
**(Scheme to Defraud the Citizens of John Celona's Honest Services)**

105. The Grand Jury realleges and incorporates by reference paragraphs 1 through 12 of this Indictment, as though fully set forth herein. .

106. The Grand Jury further charges that, as described in paragraphs 97–103 of Count 2, of this Indictment, as though fully set forth herein, from in or about August1997, through in or about January 8, 2004, defendants, URCIUOLI, DRISCOLL, SANGERMANO and RWMC, devised and intended to devise a scheme and artifice to defraud the State of Rhode Island and its citizens of their intangible right to the honest services of John Celona and to have those services performed free from deceit, favoritism, bias, conflict of interest and self-enrichment.

## Execution of the Scheme to Defraud

107. On or about the dates indicated below, in the District of Rhode Island, for the purpose of executing the scheme and artifice to defraud described in paragraphs 105-106, defendants, URCIUOLI, SANGERMANO and RWMC, did knowingly and willfully cause to be placed in an authorized depository for mail matter, checks drawn from the Village's Capital Account and made payable to John Celona, in the amounts stated in each Count below, which items were to be delivered by the United States Postal Service:

| Count | Date | Check No | Amount |
|---|---|---|---|
| 3 | 1/10/2001 | 1069 | $3,569.24 |
| 4 | 2/1/2001 | 1074 | $3,569.24 |
| 5 | 2/27/2001 | 1075 | $4,461.55 |
| 6 | 3/29/2001 | 1076 | $3,569.24 |
| 7 | 4/27/2001 | 1080 | $3,569.24 |
| 8 | 5/31/2001 | 1087 | $4,461.55 |
| 9 | 6/29/2001 | 1088 | $3,569.24 |
| 10 | 7/30/2001 | 1091 | $4,461.55 |
| 11 | 9/17/2001 | 1003 | $3,569.24 |
| 12 | 10/19/2001 | 1007 | $3,569.24 |
| 13 | 11/6/2001 | 1009 | $4,461.55 |
| 14 | 12/1/2001 | 1010 | $3,569.24 |
| 15 | 1/3/2002 | 1012 | $3,569.24 |
| 16 | 1/30/2002 | 1014 | $3,569.24 |
| 17 | 3/1/2002 | 1016 | $5,000.00 |
| 18 | 3/27/2002 | 1018 | $4,000.00 |
| 19 | 4/29/2002 | 1020 | $5,000.00 |

| Count | Date | Check No | Amount |
|---|---|---|---|
| 20 | 6/26/2002 | 1024 | $4,000.00 |
| 21 | 07/30/2002 | 1026 | $5,000.00 |
| 22 | 8/26/2002 | 1027 | $4,000.00 |
| 23 | 9/24/2002 | 1028 | $4,000.00 |
| 24 | 10/24/2002 | 1029 | $5,000.00 |
| 25 | 11/25/2002 | 1030 | $4,000.00 |
| 26 | 12/23/2002 | 1031 | $5,000.00 |
| 27 | 1/28/2003 | 1032 | $4,000.00 |
| 28 | 2/24/2003 | 1033 | $4,000.00 |
| 29 | 3/24/2003 | 1034 | $4,000.00 |
| 30 | 4/25/2003 | 1035 | $5,000.00 |
| 31 | 5/27/2003 | 1036 | $4,000.00 |
| 32 | 6/20/2003 | 1037 | $4,000.00 |
| 33 | 7/23/2003 | 1038 | $5,000.00 |
| 34 | 8/25/2003 | 1039 | $4,000.00 |
| 35 | 9/22/2003 | 1040 | $5,000.00 |
| 36 | 10/23/2003 | 1041 | $4,000.00 |

| Count | Date | Check No. | Amount |
|---|---|---|---|
| 37 | 11/24/2003 | 1042 | $4,000.00 |
| 38 | 1/8/2004 | 1043 | $5,000.00 |

All in violation of 18 U.S.C. §§ 2, 1341 and 1346.

A TRUE BILL:

FOREPERSON

ROBERT CLARK CORRENTE
UNITED STATES ATTORNEY

GERARD B. SULLIVAN
CRIMINAL CHIEF

LUIS M. MATOS
ASSISTANT U.S. ATTORNEY

DULCE DONOVAN
ASSISTANT U.S. ATTORNEY

DATED: January 5, 2006